## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **HOSPITAL DEL MAESTRO ,**<br>**on behalf of itself and all others similarly**<br>**situated,** | **CASE NO.** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |
| **v.** | |
| **CSL LIMITED, CSL BEHRING LLC, and**<br>**BAXTER INTERNATIONAL, INC.,** | |
| **Defendants.** | |

Plaintiff Hospital Del Maestro ("Plaintiff"), individually and on behalf of a class of all others similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants Baxter International, Inc, CSL Limited, and CSL Behring LLC.  Plaintiff demands a trial by jury.

### BACKGROUND

1.      Plaintiff brings this action on behalf of a class of purchasers of Blood Plasma Proteins as defined below, to recover for the injuries Plaintiff and members of the Class incurred by paying artificially inflated prices as a result of Defendants' conduct as alleged in this Complaint.  Plaintiff alleges Defendants engaged in a conspiracy to restrict output and to fix, raise, maintain and/or stabilize the prices for Blood Plasma Proteins causing purchasers of Blood Plasma Proteins to pay artificially inflated prices, in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1, from at least October 1, 2004 until the present (the "Class Period").

2.  Plasma is the watery liquid in which blood cells are suspended. It is derived from humans during blood and/or plasma donations. The type of blood plasma obtained as a byproduct of whole blood collected during blood donations is typically referred to as "recovered plasma" and comes from unpaid volunteers. Plasma collected from plasma donations is commonly referred to as "source plasma" and comes from paid donors.

3.  Blood Plasma Proteins are medically necessary plasma-based products used primarily by hospitals to treat critically ill patients suffering from serious illnesses such as hemophilia, kidney disease, immune disorders and other chronic and acute medical conditions.

4.  The Blood Plasma Proteins at issue in this Complaint are Immune globulin ("Ig"), a widely used drug that can be administered intravenously ("IVIG" or "IGIV") or subcutaneously ("SCIG") and Albumin. Ig and Albumin are referred to collectively in this Complaint as Blood Plasma Proteins. The market for Ig and the market for Albumin are referred to collectively herein as the Blood Plasma Proteins markets.

5.  Because Blood Plasma Proteins have no suitable substitutes, hospitals, physicians and other purchasers must pay prevailing prices for such products to ensure treatment of critically ill patients.

6.  The Blood Plasma Proteins industry is valued at $14 billion globally. The United States accounts for approximately 70 percent of the world's supply of plasma.

7.  The annual cost for Blood Plasma Protein Therapies can exceed $90,000 per patient in some cases.

8.    The Defendants are the primary developers, manufacturers and sellers of Blood Plasma Proteins in the United States and collectively sell billions of dollars worth of Blood Plasma Proteins every year in the United States.

9.    The Blood Plasma Proteins industry has experienced significant consolidation in recent years.  In an action recently filed by the Federal Trade Commission ("FTC") to bar the merger of two Blood Plasma Proteins producers, it was revealed that this consolidation has resulted in an industry that operates as a tight oligopoly, with high level information-sharing among the remaining participants and interdependence among firms.  Through such information sharing, Defendants have recognized and agreed that they are better off avoiding competition, restricting supply and raising prices.  Keenly aware that these practices are profitable only if all firms cooperate, Defendants monitor and enforce the agreement.

10.    The FTC concluded that the highly concentrated Blood Plasma Proteins markets are "exhibiting troubling signs of coordinated behavior."  The FTC found that Blood Plasma Proteins producers signal each other with key words to:

- Suggest to each other that increasing the production of lifesaving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for key products;

- Remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- Encourage each other to only increase supply incrementally to keep pace with demand and not increase supply to the extent the firms would actually compete with each other for market share.

11.    Similar language has been found to be evidence supporting the existence of an illegal price fixing conspiracy.  *See, e.g., In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (referring to competitor as a "friendly

competitor," mentioning an "understanding between the companies that … causes [them] not to … make irrational decisions," and querying whether competitors will "play by the rules (discipline)," can all be evidence of an explicit agreement to fix prices.

## JURISDICTION AND VENUE

12.     Plaintiff brings this action under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 1, 15, and 26).

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

14.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d).  During the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in this District.

15.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business throughout the United States, including in this District; sold Blood Plasma Proteins throughout the United States, including in this District; had substantial contacts with the United States, including in this District; or engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons located in, or doing business throughout the United States, including this District.

## PARTIES

16.     Plaintiff Hospital Del Maestro is a Puerto Rican corporation with its principal place of business at 550 Sergio Cuevas, San Juan, Puerto Rico.  During the Class Period, Plaintiff purchased Blood Plasma Proteins directly from one or more of the Defendants.  As a result of the conspiracy alleged in this Complaint, Plaintiff paid prices for Blood Plasma

Proteins that were higher than they otherwise would have been and was injured in its business and property by reason of the antitrust violations alleged herein.

17.     Defendant Baxter International Inc., a global, diversified healthcare company, is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois 60015. Baxter is the leading manufacturer of Blood Plasma Proteins as well as the largest producer of such products in the United States. Baxter's BioScience division is responsible for manufacturing and selling its plasma-based proteins. Baxter maintains 15 manufacturing facilities in the United States and its territories, as well as facilities in 23 other countries. Baxter's BioScience segment has 11 manufacturing sites domestically and abroad. Baxter's 2008 revenues exceeded $12 billion, with approximately 20% of its sales coming from plasma products.

18.     Defendant CSL Limited is an Australian corporation with its principal place of business at 45 Popular Road, Parkville, Victoria, 3052, Australia. CSL Limited is the second largest supplier of Blood Plasma Proteins in the world. CSL Limited is a vertically integrated company, and owns and operates one of the world's largest plasma collection networks, CSL Plasma, with collection facilities and laboratories in Boca Raton, Florida and Marburg, Germany. It also owns and operates manufacturing sites, through its wholly-owned subsidiaries, in Marbury, Germany and Bern, Switzerland. CSL Limited had worldwide sales of approximately $2.4 billion for its 2008 fiscal year.

19.     Defendant CSL Behring LLC is a Delaware corporation with its principal place of business at 1020 First Avenue, King of Prussia, Pennsylvania 19406-0901. CSL Behring LLC is a wholly-owned U.S. subsidiary of Defendant CSL Limited, and is the second largest producer of plasma products in the United States. CSL Behring owns and operates more than

70 plasma collection facilities in the United States and Germany, and three plasma manufacturing centers, including one in Kankakee, Illinois. CSL Behring had sales revenue of approximately $1.8 billion for its 2008 fiscal year.

20.     Defendants CSL Limited and CSL Behring LLC are referred to herein collectively as "CSL."

## CO-CONSPIRATORS

21.     Various other individuals, firms and corporations, not named as Defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name subsequently some or all of these persons as Defendants.

22.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or though its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## INTERSTATE TRADE AND COMMERCE

23.     The unlawful activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

24.     Throughout the Class Period, Defendants and their co- conspirators marketed and sold Blood Plasma Proteins in a continuous and uninterrupted flow of interstate commerce to customers located throughout the United States.

25.     Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to market and sell Blood Plasma Proteins.

26.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### THE BLOOD PLASMA PROTEINS INDUSTRY

27.     Blood plasma therapies are unique among pharmaceuticals and biologics because their production begins with a biological starting material, human plasma, instead of a chemical or synthetic, which is the starting material for a majority of pharmaceuticals.

28.     Human plasma is abundant in a number of proteins, including Albumin, clotting factors, immunoglobins and alpha-1 proteinase inhibitors.  These proteins are utilized to make therapies that treat rare, chronic, often genetic diseases, such as hemophilia, primary immunodeficiencies and alpha-1 antitrypsin deficiency, and acute conditions such as burns and shock.

29.     The ability to produce high-quality blood plasma-derivative therapies depends on the willingness of people to donate plasma.  In the United States, plasma can be donated at any of the 380 donation sites that are licensed by the Food and Drug Administration ("FDA").

30.     The process of donating blood plasma is a long and tedious one.  The first donation can take up to three hours of a patient's time, and involves a series of screenings, donor education, and the actual donation process itself.  After the first donation, subsequent donations can take up to two hours.

31.     The manufacturing process of Blood Plasma Proteins is done through a process called fractionation.  The process is unique to Blood Plasma Proteins.  In this process, the plasma is pooled, purified, and processed to extract specific plasma proteins that have a proven health benefit.  Therapeutic proteins are then extracted from a plasma production pool of

multiple donations in a specific order. These proteins are separated using a linked series of steps with varying conditions of temperature, pH, and ethanol concentration, among others. The number of proteins that are extracted from this pool is known as the yield. Due to the complexity of the fractionation process, the time between donation and final product release can take anywhere between seven and nine months.

32. The manufacturing process is highly regulated because plasma products run the risk of containing and transmitting infections. Regulators include the United States FDA, state regulatory agencies, and the Plasma Protein Therapeutics Association ("PPTA"), an industry self-regulatory body.

33. The FDA must approve plasma collection centers and the plants at which Blood Plasma Proteins are made, as well as the products themselves. To obtain approval, the products must be produced from plasma collected in the United States at collection centers approved by the FDA. The products also must be manufactured at plants approved by the FDA.

34. Performing the requisite clinical trials and undergoing the FDA approval process for plasma and plasma-derivative proteins, including Blood Plasma Proteins, takes well over two years. Accordingly, Blood Plasma Proteins sold outside of the United States are not viable competitive alternatives for United States customers, who cannot buy these products even in the event of a price increase for products available in the United States.

35. Blood Plasma Proteins are essential for treating a number of serious illnesses, including immune deficiency diseases, coagulation disorders, and respiratory diseases. The most prominent plasma-derivative proteins are: (1) Ig; (2) Albumin; (3) Alpha-1; and (4) Rho-D.

36.     IVIG, the more predominant form of Ig, has over 20 FDA- approved indications, and as many as 150 off-label uses.  Ig products are antibody-rich plasma therapies that long have been used in the treatment of primary immune deficiencies (to provide antibodies a patient is unable to make) and certain autoimmune disorders where it is believed to act as an immune modulator.

37.     Ig represents the largest plasma-derived protein product by value.  It is estimated that 70% of IVIG sold in the United States in 2007 was purchased by hospitals through contracts negotiated with GPOs.  Physician offices represented about 13% of IGIV volume, and homecare companies and specialty pharmacies represented about 17% of IGIV volume.

38.     Albumin is the most abundant protein in human plasma.  It is synthesized by the liver and performs multiple functions, including the transport of many small molecules in the blood and the binding of toxins and heavy metals.  Albumin is used as a blood volume expander, to prime heart values during surgery and to treat liver disease.  It is generally used in surgical and trauma settings and sold to hospital groups.

39.     Baxter and CLS are the world's leading plasma-derived products producers.  Combined, they have about 60% of both the Ig and Albumin markets.

40.     Prices for Blood Plasma Proteins have increased during the Class Period.

41.     In 2006, the U.S. Bureau of Labor Statistics added human blood plasma services to its Producer Price Index ("PPI").  A PPI is a measure of the average change over a given period of time in the selling prices received by domestic producers for their output.  The PPI for human blood plasma services is shown below:



Source: U.S. Bureau of Labor Statistics

## THE CONSPIRACY

42.     Controlling output is critical to preventing price competition.  Purchasers of Blood Plasma Proteins must pay prevailing prices to make treatment available to critically ill patients.  As a result, small changes in production levels cause dramatic swings in prices for products.  Limiting the supply of Blood Plasma Proteins serves to raise prices, and producers stand to increase profits greatly by controlling output relative to demand.

43.     In the early 2000s, the blood plasma products industry was burdened with poor fundamentals, including excess capacity and lack of pricing power.  As a result, the industry was forced to consolidate and in the process, eliminated substantial capacity.

10

44.     As part of the consolidation, producers acquired not just other producers, but also acquired plasma collection centers. This was done to achieve greater vertical integration, gain greater control of the plasma supply, to ensure quality control, and to reduce costs. This vertical integration resulted in about 80% of plasma collection centers being owned by plasma-products companies such as Baxter, CSL Limited, Grifols USA, and Talecris Biotherapeutics Holdings Corporation.

45.     For example, in July 2000, CSL acquired ZLB Blood Transfusion Service from the Swiss Red Cross. ZLB Plasma Services (now called CSL Plasma) was established in 2001, when CSL acquired 47 plasma collection centers and lab facilities in the United States. In 2004, CSL acquired Aventis Behring L.L.C.'s plasma products business. CSL subsequently closed 35 plasma collection centers in the United States, reduced plasma collections by 1 million liters, and reduced plant output by 1.1 million liters. Then, in 2006, ZLB Behring acquired CytoGam.

46.     In late 2000, Baxter acquired 42 plasma collection centers and a laboratory from Alpha Therapeutic Corporation (Mitsubishi Pharma). In 2003 Baxter closed 26 of its own plasma collection centers in the United States. That same year it acquired 38 collection centers from Alpha Therapeutic, some of which it sold and then closed.

47.     By 2003, the number of producers had dropped from thirteen to nine. In 2005, a major non-profit entity, the American Red Cross, exited the plasma products industry. Since 2005, there have been only five Blood Plasma Protein products producers: CSL, Baxter, Talecris, Grifols, and Octapharma USA, Inc. Additionally, the supply of plasma was reduced by an estimated 28% between 2000 and 2005.

48.     As competition and plasma supply was eliminated through consolidation in the Blood Plasma Protein products industry, prices increased dramatically.

49.     In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were experiencing problems purchasing Ig.  In February 2007, it issued a report entitled *Analysis of Supply, Distribution, Demand, and Access Issues Associated with Immune Globulin Intravenous (IGIV)* ("HHS Report").  The HHS Report found that a majority of hospitals surveyed could not purchase enough IGIV to meet all of their patient needs, and calculated that the shortfall of supply relative to demand was approximately 14%.  The HHS Report stated that Ig "manufacturers are currently allocating IGIV to their customers.  Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations.  In economic terms, current IGIV supplies are being rationed."

50.     It now appears that these price increases and supply problems were not the result of natural market forces, but rather the result of a concerted effort by Defendants to restrict the output of Blood Plasma Proteins in order to increase prices.

51.     By the mid-2000s, due to the market changes brought about by consolidation, Defendants had come to recognize that controlling capacity was critical to preventing price competition.  Accordingly, beginning at least as early as October 1, 2004, Defendants implemented an illegal agreement to fix prices for Blood Plasma Proteins by coordinating and restricting output.

52.     Defendants have implemented this agreement through signaling – *i.e.*, the intentional sharing of competitive information for purposes of securing accommodating reactions from competitors.  The FTC found numerous examples of signaling among the Defendants.

53. Defendants used language at public events, among other places, that suggested the existence of an illegal price-fixing conspiracy. This language included references to "understanding" among companies, "irrational" decisions, "play by the rules," and "discipline."

54. Baxter's CFO acknowledged Defendants' signaling in a recent investor call, stating:

> Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamics], I just don't see why we would. It wouldn't make any sense and from everything we read and all the signals we get, there is nothing that says anyone would do that. I think people are very consistent in the messages they deliver, which are pretty consistent with what we have told you today.

Additionally, Baxter has recognized that as long as competitors are not "irrational" and do not "trash price and take share," then they can increase supply steadily in line with market demand to keep prices high.

55. Defendants often signaled publicly their desire to raise prices. For example, on October 18, 2007, Baxter's CFO and Corporate Vice President, Rob Davis, stated on a Q3 2007 earnings conference call that with respect to Baxter's plasma business, there was going to be "price appreciation," and that Baxter expected to see "low to mid single digit price growth over our long-range horizon."

56. In addition to signaling, Defendants engaged in secretive information sharing. The extent of Defendants' improper information sharing was recently revealed by the FTC which, in its investigation, found that the manufacturers are "collecting and cataloging an extraordinary wealth of timely competitive information, to ensure that all are engaging in desired 'rational' and 'disciplined' behavior."

57. Through this information sharing, Defendants have developed sophisticated oligopoly models to estimate and predict changes in supply and demand.

58.     CSL explored means of punishing firms that did not comply with the Defendants' agreed-upon output levels, particularly Talecris, that attempted in some instances to increase capacity and output in contravention of the prevailing restrained approach.

59.     Defendants' conspiracy has been successful.  It has resulted not only in supracompetitive pricing, but also extraordinary profits for Defendants, even as most other industries have experienced drastically lowered earnings in the face of the global economic downturn.

60.     The HHS Report found that average prices for IGIV have been steadily increasing since 2004 and the upward trend was expected to continue through 2007.  For example, in 2004 the average price for liquid IGIV was approximately $44 per gram, while for the first half of 2006, the price had risen to almost $48 per gram.  By 2009, according to an analyst presentation by Grifols on March 5, 2008, the price for IVIG was projected to reach $57 a gram.

61.     The average price of Albumin has increased from about $1.25 per gram in 2005 to about $2.20 per gram, according to the same Grifols presentation.  The presentation also reports that "average albumin prices have steadily increased since 2005 from U.S. $14 to around U.S. $35 per 12.5 g. vial at present."

62.     In 2006, CSL had profits of $351 million, with sales of Blood Plasma Protein products such as IVIG and Albumin generating about 90% of its earnings.  For the half-year ended December 31, 2008, CSL reported profits of $502 million.

63.     In 2008, Baxter's BioScience unit reported revenues of $1.36 billion, an increase of 12% largely due to sales of blood plasma-based products.  Due to the profit its

BioScience unit has generated, one news article noted that "Baxter is one of a handful of stocks that have proven somewhat resistant to the global recession."

64.     Baxter explained in a recent investor call how competitors have "lived through the events of the early 2000s," referring to the period of excess supply and lower prices, and now have returned to a time of "very good stock prices and very good returns for shareholders."

65.     Similarly, in June 2007 at the Plasma Protein Forum, in Reston, Virginia, attended by numerous industry executives, including Defendant representatives, Peter Turner, PPTA Chairman and President of CSL Behring, "declared the industry to be in 'good shape' after a few bumps in the road in years past."

## FACTORS INCREASING THE
## MARKETS' SUSCEPTIBILITY TO CONSPIRACY

66.     The structure and characteristics of the Blood Plasma Proteins markets, such as the concentrated market share held by Defendants, the absence of competitive fringe of sellers, the commodity-like nature of Blood Plasma Proteins, the lack of available substitutes, the inelasticity of demand, the high barriers to entry, the presence of many buyers, and opportunities for competitor communication all make the Blood Plasma Proteins market susceptible to anticompetitive conduct and make the conspiracy alleged herein plausible.

67.     Throughout the Class Period, Defendants collectively possessed market power to raise prices above competitive levels in the Blood Plasma Proteins markets in the United States without losing appreciable market share to non-conspirators.

## **Concentrated Market Share Held by Defendants**

68.     A high degree of market share concentration facilitates the operation of an anticompetitive cartel such as the one alleged in this Complaint because it makes it easier to coordinate behavior among co-conspirators, and makes it more difficult for customers to avoid the effects of collusive behavior.

69.     Defendants control a high percentage of the United States Blood Plasma Proteins market, collectively possessing about a 60% market share.  Specifically, Baxter controls about 36% of the market and CSL controls about 24% of the market.  The remaining manufacturers, Talecris, Grifols and Octapharma, possess shares of approximately 23%, 7% and 5% respectively.

70.     With respect to the domestic Ig market, according to 2008 sales volumes, Defendants collectively possess approximately a 62.9% market share.  CSL has approximately a 27.5% market share and Baxter has approximately a 35.4% market share.  The remaining manufacturers, Talecris, Grifols and Octapharma, possess shares of approximately 20.9%, 9% and 7.2% respectively.

71.     The Herfindahl-Hirshchman Index ("HHI") is a measure of industry concentration that economists often use to quantify the degree of market concentration.  The U.S. Department of Justice ("DOJ") considers an HHI higher than 1800 to be a highly concentrated market.  The Ig market is highly concentrated, with an HHI of 2,579.

72.     With respect to the domestic Albumin market, according to 2008 sales volumes, Defendants collectively possess approximately a 73.05% market share.  CSL possesses approximately a 36.61% market share and Baxter maintains approximately a 36.44% market share.  The remaining competitors, Talecris, Grifols, and Octapharma, possess shares of

8.83%, 13.06%, and 5.07%, respectively. The Albumin market is highly concentrated, with an HHI of 2,942.

## Commodity-Like Nature of Blood Plasma Proteins

73. A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question, and it is easier to effectively monitor those prices.

74. Blood Plasma Proteins are homogeneous, commodity-like products within each given market (*e.g.*, Ig and Albumin) and one Defendant's Blood Plasma Proteins can be substituted for the Blood Plasma Proteins made by the other Defendants. Indeed, the FTC has found that, "Within each relevant [Blood Plasma Proteins] market, the product offerings of Defendants are largely homogenous."

75. Because the Blood Plasma Proteins offered by Defendants are homogenous, commodity-like products, competition is based predominantly, if not entirely, on price.

## Lack of Substitutes

76. The lack of available substitutes for a product also helps facilitate an effective price-fixing conspiracy. In the absence of substitutes, producers of the product in question are able to raise product prices without losing significant sales.

77. There are no substitutes for either Ig or Albumin. As such, purchasers of Blood Plasma Proteins must pay the prevailing price, if necessary, to make treatment available to critically ill patients.

17

**Inelastic Demand**

78.     Inelastic demand for a product means that price increases do not result in fewer sales.  In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining revenues and profits.

79.     The demand for Blood Plasma Proteins is highly inelastic.  Blood Plasma Proteins are considered medical necessities.  Because Blood Plasma Proteins have no substitutes, hospitals and physicians will purchase them at whatever price they are offered.

80.     Additionally, small changes in production levels cause dramatic swings in prices for Blood Plasma Proteins, and producers stand to increase profits greatly by controlling output relative to demand.

81.     Thus, Blood Plasma Proteins are excellent candidates for cartelization because price increases do not result in fewer sales.

**Barriers to Entry**

82.     All other things being equal, supra-competitive pricing and the attendant high levels of profitability normally attract new market entrants who want to avail themselves of such pricing and profits.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

83.     There are significant barriers to entry in the Blood Plasma Proteins markets which have prevented potential competitors from entering and competing during the Class Period.

84.     Each step of the manufacturing process for Blood Plasma Proteins involves substantial up-front, sunk costs, onerous and lengthy regulatory approvals by federal and state agencies, and specialized technical know-how and expertise.  According to the PPTA, "the development of new plasma derived therapies is difficult and requires significant investment from manufacturers.  Considerable research efforts and dedicated resources are required in new therapeutic areas to demonstrate clinical efficacy."

85.     Additionally, entry into the Blood Plasma Proteins markets requires a significant amount of intellectual property, including patents, copyrights, trademarks, trade secrets, know-how and confidentiality agreements relating to purification of products and pathogen safety, and substantial product research and development.

86.     Moreover, each Blood Plasma Protein must be approved for sale in the United States by the FDA.  To obtain approval, the products must be produced from plasma collected in the United States at collection centers approved by the FDA.  The products also must be manufactured at plants approved by the FDA.  Such regulatory hurdles impose significant barriers to entry and extend the time it would take to enter the United States markets, let alone make significant impact in the markets.

87.     Only a determined competitor with the specialized knowledge needed to manufacture Blood Plasma Proteins and the capital, time and ability necessary to meet the FDA's strict licensing requirements can compete in this market.  In light of these hurdles to entry, Defendants have not had to face substantial new competition in recent history.

**Many Buyers**

88.     With the presence of many buyers in a market, each of whom forms a small share of the marketplace, there is less incentive for cartel members to cheat on collusive

pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

89. There are many customers who purchase Blood Plasma Proteins. In its 2005 10-K, Baxter stated that its products are used by "hospitals, clinical and medical research laboratories, blood and plasma collection centers, kidney dialysis centers, rehabilitation centers, nursing homes, doctors' offices and by patients at home under physician supervision." Similarly, CSL Limited stated in its 2007 Annual Report that it minimized "the credit risks associated with trade and other debtors by undertaking transactions with a large number of customers in various countries."

## Opportunities for Competitor Contact and Communication

90. The oligopolistic structure of the market enabled Defendants to share competitive information. This factor also enabled Defendants to closely monitor each other's activities with respect to plasma collection, manufacturing, and output.

91. Collaboration fostered through industry associations facilitates relationships among individuals and entities who would otherwise be predisposed to vigorously compete with each other. Here, Defendants are members of trade associations and regularly attend meetings together.

92. For example, Defendants are members of the Plasma Protein Therapeutics Association ("PPTA"). The PPTA is "the primary advocate for the world's leading source plasma collectors and producers of plasma-based and recombinant biological therapeutics." Defendants are Global, North American, and European Members of the association, and their high-level executives, including Peter Turner, President of CSL Behring, and Larry Guiheen, President of Baxter BioScience, serve on the association's Global Board of Directors. Mr.

Turner also serves as the association's president. The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June, in the Washington, D.C. metropolitan area, and high-level executives from Defendants, such as Messrs. Turner and Guiheen, routinely attend.

93.     Such trade association meetings provide the opportunity for participants in price-fixing conspiracies such as this one to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

94.     The opportunity to conspire is also enhanced where there are business relationships among competitors. Such relationships existed in this industry. According to Talecris's S-1/A filed with the SEC on November 19, 2007, it obtained 33% of its plasma from CSL until June 30, 2007.

## FTC INVESTIGATION

95.     The FTC recently investigated the Blood Plasma Proteins market and uncovered evidence suggesting the existence of an illegal price-fixing conspiracy.

96.     The circumstances surrounding the FTC's investigation involved a potential acquisition of Talecris by CSL. Pursuant to an Agreement and Plan of Merger, dated August 12, 2008, CSL proposed to acquire all of the outstanding voting securities of Talecris in a transaction valued at $3.1 billion.

97.     The proposed merger was reviewed for potential anticompetitive effects by the FTC. After an extensive eight-month investigation, which included testimony and declarations from 21 witnesses, on May 27, 2009, the FTC filed an administrative complaint to block the proposed merger. On June 2, 2009, the FTC filed a complaint in the United States District Court for the District of Columbia seeking a temporary restraining order and preliminary

injunction to block the proposed merger. In both complaints (collectively, "FTC Complaints"), the FTC asserted that the proposed merger would violate Section 5 of the Federal Trade Commission Act, as amended, 1 U.S.C. § 45, by (1) making CSL the world's largest maker of blood plasma products; (2) substantially reducing competition in the U.S. market for Blood Plasma Proteins, among other plasma-based products; (3) limiting industry supply of Blood Plasma Proteins, among other plasma-based products; and (4) causing increased prices for Blood Plasma Proteins, among other plasma-based products.

98.     The FTC Complaints assert that industry consolidation in recent years emboldened producers to seek to avoid competition, restrict supply and raise prices.

99.     While the FTC Complaints are redacted, in a motion to place the unredacted complaint on the public record, the FTC stated that the redacted language "suggests a strong possibility of ongoing coordinated interaction between firms in the plasma industry."

100.     In the motion, the FTC also states that the redacted language "is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy," citing *In Re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (referring to competitor as a "friendly competitor," mentioning an "understanding between the companies that ... causes [them] not to ... make irrational decisions," and querying whether competitors will "play by the rules (discipline)" can all be evidence of an explicit agreement to fix prices).

101.     CSL has opposed the FTC's motion to place the unredacted complaint on the public record. The FTC has responded by stating that the redacted material does not qualify as confidential business information, and that while disclosure of the material could cause

"embarrassment" and "could 'expose respondent to possible treble damages actions,'" those reasons are not sufficient to prevent disclosure.

102.    On June 8, 2009, CSL and Talecris announced that they agreed to terminate their merger agreement.  On June 15, 2009, the FTC and CSL filed a joint motion to dismiss the Complaint.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States who purchased Blood Plasma Proteins directly from any Defendant between and including October 1, 2004 and the present. Excluded from the Class are any judicial officer who is assigned to hear any aspect of this action, governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

104.    Plaintiff believes that there are at least thousands of Class members, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

105.    There are questions of law and fact common to the Class, including:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Blood Plasma Proteins and/or engaged in market allocation for these products sold in the United States.

(b)    The identity of the participants in the conspiracy;

(c)     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

(f)     The effect of Defendants' conspiracy on the prices of Blood Plasma Proteins sold in the United States during the Class Period; and

(g)     The appropriate measure of damages sustained by Plaintiff and other members of the Class.

106.    Plaintiff is a direct purchaser of Blood Plasma Proteins and its interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class.  In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

107.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

108.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

24

109.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  This Class is readily definable.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## CAUSE OF ACTION

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT -15 U.S.C, § 1

110.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

111.    Beginning at least as early as October 1, 2004, and continuing thereafter, Defendants and their unnamed co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain, or stabilize prices for Blood Plasma Proteins in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.    Based on the foregoing, and on information and belief, in formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to restrict output and to artificially raise, fix, maintain, or stabilize the price of Blood Plasma Proteins sold in the U.S.  These activities included:

(a)     participation in conversations or communications to discuss the supply and price of Blood Plasma Proteins in the United States;

(b)     agreeing during those conversations or communications to restrict output and to charge prices at specified levels and otherwise to increase or maintain prices of Blood Plasma Proteins sold in the United States; and

(c)     agreeing during those conversations or communications to restrict output and to fix or stabilize prices of Blood Plasma Proteins sold in the United States.

113.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

114.    Throughout the Class Period, Plaintiff and the other Class members purchased Blood Plasma Proteins from Defendants (or their subsidiaries or controlled affiliates) or their co- conspirators at supra-competitive prices.

115.    Defendants' unlawful conspiracy had and is having the following effects, among others:

(a)     prices charged to Plaintiff and the Class for Blood Plasma Proteins have been fixed, maintained, or stabilized at higher, artificially derived, non-competitive levels;

(b)     Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the sale of Blood Plasma Proteins; and

(c)     competition in establishing Blood Plasma Proteins prices in the United States has been unlawfully restrained, suppressed and eliminated.

116.    Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.

26

117.    Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## ACCRUAL OF CLAIM, EQUITABLE TOLLING, EQUITABLE ESTOPPEL, AND FRAUDULENT CONCEALMENT

118.    Plaintiff had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place it on inquiry notice of the antitrust claims set forth in this Complaint, until shortly before this Complaint was filed.

119.    Plaintiff did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.  Nor could Plaintiff have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  The conspiracy was by its nature self-concealing.

120.    Only after May 27, 2009, when the FTC filed an administrative complaint to block the proposed merger of CSL and Talecris was the existence of the conspiracy disclosed to the public.

121.    As an example of Defendants' affirmative acts of concealment, and as alleged in this Complaint, Defendants used key words to signal their intentions to restrict output and increase prices.  Plaintiff was unaware that the use of these key words had special meaning.

122.    Plaintiff has also alleged in this Complaint that Defendants were secretly sharing competitively sensitive information.

123.    Accordingly, Defendants engaged in a successful, illegal price-fixing conspiracy with respect to Blood Plasma Proteins, which they affirmatively concealed by

agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of the illegal scheme; by engaging in secret meetings, telephone calls, and other communications in order to further their illicit cartel; and by giving false and pretextual reasons for their pricing of Blood Plasma Proteins, for the increases in those prices during the relevant period and by describing such pricing and increases falsely as being a result of external costs rather than collusion.

124.    As a result, Plaintiff and the members of the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class during the Class Period.

## **DEMAND FOR JURY TRIAL**

125.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and that Plaintiff be deemed to be an adequate representative of the Class.

B.    That the combination or conspiracy and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law.

     D.     That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law.

     E.     That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

     F.     That Defendants be enjoined from continuing their participation in the alleged conspiracy.

     G.     For such other and further relief that the Court finds just and proper under the circumstances.

Dated: October 29th 2009          Respectfully submitted,

          FREED KANNER LONDON & MILLEN LLC

          /s/ Steven A. Kanner
          Steven A. Kanner
          Douglas A. Millen
          2201 Waukegan Road, Suite 130
          Bannockburn, IL  60015
          Tel:  (224) 632-4500
          Fax:  (224) 632-4521
          Email:  skanner@fklmlaw.com
                  dmillen@fklmlaw.com

          W. Joseph Bruckner
          Elizabeth R. Odette
          **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
          100 Washington Avenue South
          Suite 2200
          Minneapolis, MN  55401
          Tel:     (612) 339-6900
          Fax:     (612) 339-0981
          Email:  wjbruckner@locklaw.com
                  erodette@locklaw.com

          *Attorneys for Plaintiff Hospital Del Maestro*